| | |
|---|---|
| **Jane Doe, individually and as representative of a class of similarly situated persons of the Retirement Plan for Officers of Columbia University and the Columbia University Voluntary Retirement Savings Plan,** **Plaintiff,** **-- against --** **Columbia University and Vice President of Human Resources, Dianne Kenney** **Defendants.** | **COMPLAINT** **No.** **JURY TRIAL DEMANDED** |

## COMPLAINT

1.      Plaintiff Jane Doe individually as representative of a class of participants and beneficiaries in the Retirement Plan for Officers of Columbia University and the Columbia University Voluntary Retirement Savings Plan (collectively the "Plans"), brings this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plan against Defendants Columbia University, the Trustees of Columbia University, and Diane Kenney (collectively "Columbia University" or "Defendants") for breach of fiduciary duties under ERISA.[1]

### I.      NATURE OF THE CASE

2.      This case involves more than 27,000 participants and former participants of the Plans.  The case is of vital importance because today retirement plans have become the primary

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461.

tool for retirement planning and savings for millions of working Americans. Employers that fail in their duties to offer their captive employees prudent investment choices subject their employees' hard-earned retirement savings to risk of loss of value due to poor investment performance. For employees victimized by their employer's failure, what was meant to be the golden period of their lives becomes a retirement nightmare.

3.      The marketplace for retirement plan services is established and competitive. Billion-dollar defined contribution plans[2], like the Plans, have tremendous bargaining power to demand low-cost administrative and investment management services.

4.      The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As fiduciaries to the Plans, Columbia University is obligated to act for the exclusive benefit of the Plans' participants and beneficiaries. Columbia is therefore obliged to ensure that the Plans' expenses are reasonable and the Plans' investments are prudent.

5.      Columbia University failed in its duties. Instead of leveraging the bargaining power of both Plans, Columbia University caused the Plans to pay unreasonable and greatly excessive fees for recordkeeping, administrative, and investment services. Instead of using its sophistication to identify and select high-quality investments that benefited participants and beneficiaries, Columbia University selected and retained expensive and poor-performing

---

[2] A "defined-contribution" plan is a type of retirement plan in which the value of a participant's retirement accounts is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan (less expenses). *See* 29 U.S.C. § 1002(34).

investment options that consistently and historically underperformed their benchmarks and similar funds.

6.     A prudent fiduciary at the time would have known that the investments were not suitable for the Plans.  By acting contrary to their fiduciary duty, Columbia University caused both Plans, and hence participants, to suffer hundreds of millions of dollars of staggering losses to retirement savings.

7.     To remedy these fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plans, brings this action on behalf of the Plans under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plans all losses resulting from each breach of fiduciary duty. In addition, Plaintiff seeks such other equitable or remedial relief for the Plans as the Court may deem appropriate.

8.     The allegations in this complaint are based upon an investigation of public documents, including filings with the U.S. Department of Labor, documents provided to Plaintiff because of their status as Plan participants, and analytical investment data prepared by Morningstar, Inc., a leading and well-recognized independent investment research firm specializing in fund investing. As many facts are still within Defendants' exclusive possession, Plaintiff may make further changes to the claims herein after discovery.

## I.     PRELIMINARY STATEMENT

9.     Columbia University is a recognized and respected leader in the field of education.  The Columbia Business School – which is celebrating its centennial year – provides a top-ten ranked MBA program.  The School touts on its website that its faculty members are

world-renowned not only for generating new thinking in their fields but also for having a genuine impact on current business practices. The School counts 13 students and teachers who have won the Nobel Prize in Economics.

10.     Each year, thousands of Columbia University employees invested hundreds of millions of dollars in the Plans on the hopes that this world-renowned institution had constructed a stellar retirement portfolio that offered superior investment options and world-class investment management. Instead, Columbia University saddled each of their 27,000 participants with an overall sub-standard plan, loaded with $4.6 billion of investment options that were primarily poor to mediocre performers.

11.     Columbia University did not act in the best interest of the Plans and its participants. Instead, Columbia University loaded the Plans with investment products without thoroughly investigating whether the participants would be better served by investments managed by other advisers. For example, the investment performance for the TIAA-CREF Stock Account R3, which represented almost $1 billion of the Plans' assets, ranked in the bottom quartile for the past 3, 5, and 10 years for like investments according to Morningstar. The TIAA-CREF Stock Account was so imprudent that in 2012 AonHewitt, a solutions expert in pension plan administration, recommended to its clients that they remove this fund from their retirement plans.

12.     Columbia University also loaded the Plans with many retail share class options that were  more expensive than the institutional share class options in the same mutual funds that were otherwise available for Columbia University to include in the Plans.   One example is the Calvert International Equity Fund.  Columbia University offered the A Share Class at 1.39% when an Institutional Share Class was otherwise available at .96%. Columbia University also

4

offered the Vanguard 500 Index Fund Investor Share Class at a cost of .17% when an Institutional Share Class was otherwise available at .02%.

13.     Columbia University wrongfully wasted and mismanaged the assets in the Plans as a whole and thereby breached its fiduciary duties. The Plans, as a whole, lost hundreds of millions of dollars in retirement savings to this mismanagement. For a leading university that touts its business skill and acumen, the more than 27,000 current and former Columbia University employees who participated in the Plans deserved better.

## JURISDICTION AND VENUE

14.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

15.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district and division in which the Plans are administered, where at least one of the alleged breaches took place, and where all Defendants reside.

## PARTIES

**The Retirement Plan for Officers of Columbia University and The Columbia University Voluntary Retirement Savings Plan**

16.     The Retirement Plan for Officers of Columbia University and the Columbia University Voluntary Retirement Savings Plan are defined contribution, individual account, employee pension benefit plans under 29 U.S.C. § 1002(2)(A) and § 1002(34).

17. Both Plans are established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).

18. Eligible officers and employees of Columbia University and their beneficiaries are eligible to participate in the Plans, which provide the only sources of retirement income for many employees of Columbia University.

19. As of December 31, 2014, the Retirement Plan for Officers of Columbia University held $2.8 billion in assets and had 27,013 participants. The Columbia University Voluntary Retirement Savings Plan held $1.8 billion in assets and had 18,849 participants, some of whom also participated in the Retirement Plan for Officers. As such, both plans were among the largest defined contribution plans in the United States, ranking in the top 1% of all defined contribution plans that filed a Form 5500 with the Department of Labor based on total plan assets. Plans of such great size are commonly referred to as "jumbo plans".

**Plaintiff**

20. Plaintiff Jane Doe has been a participant in the Plans from October 2014 through the present.

**Defendants**

21. Columbia University is a private university with its principal place of business in New York, New York. Columbia University is governed by a body of Trustees.

22. Columbia University has delegated to Dianne Kenney, the Vice President of Human Resources, authority to administer the Plans.

**V.     ERISA'S FIDUCIARY STANDARDS**

23.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a) states, in relevant part:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

24.     Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

> The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

25.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

26.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Bierwirth*, 680 F.2d at 271, 272 n.8.

27.     Under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015)

If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).

28.     Selecting higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729 F.3d at 1137–39.

29.     In considering whether a fiduciary has breached the duties of prudence and loyalty, mere "subjective good faith" in executing these duties is not a defense; "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)

30.     ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. §1105(a) provides for fiduciary liability for a co-fiduciary's breach:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

31.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

32.    Under ERISA, "[T]he question of loss to the Plan requires a comparison between the actual performance of the Plan and the performance that would have otherwise taken place." *Donovan v. Bierwirth*, 754 F.2d 1049 (2d. Cir. 1985); *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc*., 895 F. 2d 729 (11th Cir. 1990)

## FACTS APPLICABLE TO ALL COUNTS

### I.    Plan investments

33. Under the terms of the Plans, participants are eligible to contribute a discretionary amount of their annual compensation to the Plans.  For the Retirement Plan for Officers, Columbia University makes a matching contribution.

34. Defendants exercise exclusive and discretionary authority and control over the investment options that are included in the Plans.

35. Defendants included as investment options for both Plans mutual funds and insurance company variable annuity products offered by: the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), the Vanguard Group, Inc. ("Vanguard") and Calvert Investments, Inc. ("Calvert"). Defendants select

investment options into which participants' investments are directed, and decide which investment options to remove from the Plans.

36.     As of December 31, 2014, Defendants provided over 100 investment options to participants in each of the Plans. Among the available investments, 23 were TIAA-CREF options holding almost $3.3 billion, 76 were Vanguard options holding $1.3 billion, and 21 were Calvert options holding almost $70 million. These investments included retail and institutional share class mutual funds, insurance separate accounts, variable annuity options, and fixed annuity options. The retail share class mutual funds are designed for small individual investors, not jumbo retirement plans, and are identical in every respect to institutional share class funds, except for much higher fees.

37.     These investments are designated by Defendants as available investment alternatives offered under the Plans.

38.     The TIAA Traditional Annuity offered in the Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent upon the claims-paying ability of Teachers Insurance and Annuity Association of America.

39.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge to withdraw their investment in a single lump sum within 120 days of termination of employment. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is

over a ten-year period, unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

40.     The Plans' TIAA-CREF Bond Market Account, TIAA-CREF Equity Index Account, TIAA-CREF Global Equities Account, TIAA-CREF Growth Account, TIAA-CREF Inflation-Linked Bond Account, TIAA-CREF Social Choice Account, TIAA-CREF Money Market Account, and TIAA-CREF Stock Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

41.     The expense ratio of the TIAA-CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

    a. "administrative expense" charge .165%

    b. "distribution expense" charge .06%

    c. "mortality and expense risk" charge .005%; and

    d. "investment advisory expense" charge ranging from .025% to .15%.

42.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the TIAA-CREF variable annuity accounts, the expense ratio of the TIAA-CREF Real Estate Account is made up of multiple layers of expense charges, totaling .88% of assets under management:

    a. "administrative expense" charge .265%;

    b. "distribution expense" charge .125%;

    c. "mortality and expense risk" charge .005%;

d. "liquidity guarantee" .17% ; and

e. "investment management expense" charge .325%.

43.     The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts of fees for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

44. The Vanguard investment options offered to participants are exclusively mutual funds that charge varying amounts of fees for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

45. The Calvert investment options offered to participants are exclusively mutual funds that charge varying amounts of fees for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

46. Mutual funds have shareholders who are not participants in the Plans, or any retirement plan, and who purchase shares as a result of marketing the fund. All shareholders in the mutual funds, including participants in the Plans, pay for marketing fees and expenses. However, marketing costs for mutual funds provide no benefit to Columbia plan participants because they have no control over what funds are selected for inclusion in the Plans.

II.     **Defendants' actions caused participants in both Plans to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

47.     Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous record keepers in the marketplace who are equally capable of providing a high level of service to jumbo defined

contribution plans. Competitive record keepers compete vigorously for the business of jumbo plans by offering the best price because the services provided to plans are mostly standardized.

48.     ERISA requires that plan administrative and recordkeeping expenses, among others, are and remain reasonable for the services provided. To meet this standard, prudent fiduciaries of large defined contribution plans solicit competitive bids for the plans' recordkeeping and administrative services at regular intervals of approximately three years.

49.     The cost of recordkeeping and administrative services depends on the number of participants. The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per-participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

50.     Jumbo defined contribution plans, like these Plans, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

51.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's record keeper putatively for providing recordkeeping and administrative services for the investment.

52.     Because revenue sharing arrangements provide asset-based compensation for the record keeper, prudent fiduciaries, if they choose to use revenue sharing, must monitor the total amount of revenue sharing a record keeper receives to ensure that the record keeper's compensation is reasonable for the services provided. A prudent fiduciary using revenue sharing must obtain agreement from the record keeper to ensure that all revenue sharing payments that exceed a reasonable participant-based recordkeeping fee are returned to the plan. Because revenue sharing payments are asset based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation.

53.     Prudent fiduciaries of similarly sized defined contribution plans use a single record keeper rather than hiring multiple record keepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one record keeper is used.

54.     It is well known in the defined contribution industry that plans with dozens of choices and multiple record keepers "fail" based on two primary flaws:

1. **The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.

2. **The multi-record keeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., Fixing Your 403(b) Plan: Adopting a Best Practices Approach, at 2 (Nov. 2009)(emphasis in original).[3]

55.    The benefits of using a single record keeper are clear:

By selecting a single record keeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[4]

56.    In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", AonHewitt similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

 – Consolidating record keepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.[5]

57.    Another independent investment consultant, Towers Watson, also recognized that using multiple record keepers has caused:

high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this

---

[3] Available at https://www.standard.com/pensions/publications/14883_1109.pdf
[4] *Id.*
[5] AonHewitt, How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It (Jan. 2016), available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx

complexity has made it difficult for employers to monitor available choices and provide ongoing oversight…Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, Higher Education's Response to a New Defined Contribution Environment, TOWERS WATSON VIEWPOINTS, at 2 (2012). [6]

58.     Others in the industry agree. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience*, PLANSPONSOR (Dec. 6, 2012) ("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different record keepers."); [7] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010) (identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors"). [8]

59.     Use of a single record keeper is also less confusing to participants and results in their avoiding paying excessive recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a

---

[6] Available at https://www.towerswatson.com/en-US/Insights/IC-Types/Ad-hoc-Point-of-View/2012/higher-educations-response-to-a-new-defined-contribution-environment
[7] Available at http://www.plansponsor.com/Paring-Down-Providers-A-403b-Sponsors-Experience/?fullstory=true
[8] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html

reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per participant ratio").[9]

60. Despite the long-recognized benefits of a single record keeper for a defined contribution plan, Defendants contracted with two record keepers (TIAA-CREF and Vanguard) to provide duplicative recordkeeping and administrative services. The inefficient and costly structure maintained by the fiduciaries has caused participants in the Plans to pay duplicative, excessive, and unreasonable fees for plan recordkeeping and administrative services.

61. TIAA-CREF and Vanguard received compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plans and its investments.

III.     **Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plans, including identical mutual funds in lower-cost share classes.**

62. Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management*, 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);14 Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the CrossSection of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").[10]

63. To the extent managers show any sustainable ability to beat the market the outperformance is nearly always dwarfed by mutual fund expenses.Fama & French, *Luck Versus*

---

[9] Available at http://www.plansponsor.com/vendor-consolidation-in-highereducation/?fullstory=true.
[10] Available at https://web.stanford.edu/~wfsharpe/art/active/active.htm

*Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

64. If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57 (1997).

65. Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

66. Moreover, jumbo retirement plans have enormous bargaining power to obtain low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Classifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[11]

67. Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a pre-fee basis.

68. Lower-cost institutional share classes of mutual funds compared to retail shares are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Plans.

69. Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. For example, Vanguard discloses in the prospectuses for the Vanguard Target Retirement Funds that "Certain Vanguard clients may meet the minimum investment amount by aggregating separate accounts within the same Fund or across the lineup of Vanguard Institutional Target Retirement Funds and/or Vanguard Target Retirement Funds." Therefore, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plans' sizes, if requested, the investment provider would make available lower-cost share classes for the Plans, if there were any fund that did not individually reach the threshold.

70. Despite these far lower-cost options, Defendants selected and continue to retain investment options with far higher costs than were and are available for the Plans based on their

---

[11] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537

respective size. Moreover, for the exact same mutual fund option, Defendants selected and continue to offer far higher-cost share classes of identical mutual funds than those that are easily available to the Plans. The following table lists the significantly lower-cost share classes identical to the Plan's Vanguard mutual funds that were not used:

| Plan Mutual Fund | Plan Fee | Identical Lower Cost Mutual Fund | Identical Lower Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard 500 Index-Inv (VFINX) | 17 bps[12] | Vanguard Balanced Index-Inst (VBAIX) | 2 bps | 750.00% |
| Vanguard Balanced Index-Inv (VBINX) | 26 bps | Vanguard Balanced Index-Inst (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity-Inv (VHCOX) | 48 bps | Vanguard Capital Opportunity-Adm (VHCAX) | 41 bps | 17.07% |
| Vanguard Emerging Markets Stock Index – Inv (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index- Inst (VEMIX) | 15 bps | 133.33% |
| Vanguard Equity Income-Inv (VEIPX) | 31 bps | Vanguard EquityIncome-Adm (VEIRX) | 22 bps | 40.91% |
| Vanguard European Stock Index-Inv (VEURX) | 26 bps | Vanguard European Stock Index-Inst (VESIX) | 10 bps | 160.00% |
| Vanguard Explorer-Inv (VEXPX) | 49 bps | Vanguard Explorer-Adm (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index-Inv (VEXMX) | 26 bps | Vanguard Extended Market Index-Inst Plus (VEMPX) | 8 bps | 225.00% |
| Vanguard GNMA- Inv (VFIIX) | 23 bps | Vanguard GNMAAdm (VFIJX) | 13 bps | 76.92% |
| Vanguard FTSE Social Index-Inv (VFTSX) | 29 bps | Vanguard FTSE Social Index-Inst (VFTNX) | 16 bps | 81.25% |
| Vanguard Growth & Income-Inv (VQNPX) | 32 bps | Vanguard Growth & Income-Adm (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index-Inv (VIGRX) | 26 bps | Vanguard Growth Index-Inst (VIGIX) | 8 bps | 225.00% |
| Vanguard Health Care-Inv | 36 bps | Vanguard Health Care- | 29 bps | 24.14% |

---

[12] One basis point (bps) is equal to 1/100th of one percent (or 0.01%).

| | | | | |
|---|---|---|---|---|
| (VGHCX) | | Adm (VGHAX) | | |

| | | | | |
|---|---|---|---|---|
| Vanguard Inflation Protected Securities- Inv (VIPSX) | 22 bps | Vanguard Inflation Protected Securities-Inst (VIPIX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index-Inv (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index-Inst (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Investment-Grade-Inv (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade-Adm (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury-Inv (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury-Adm (VFIUX) | 12 bps | 108.33% |
| Vanguard International Growth-Inv (VWIGX) | 49 bps | Vanguard International Growth-Adm (VWILX) | 33 bps | 48.48% |

| | | | | |
|---|---|---|---|---|
| Vanguard HighYield Corporate-Inv (VWEHX) | 28 bps | Vanguard HighYield Corporate-Adm (VWEAX) | 15 bps | 86.67% |

| | | | | |
|---|---|---|---|---|
| Vanguard Long Term Investment Grade-Inv (VWESX) | 26 bps | Vanguard Long Term Investment Grade-Adm (VWETX) | 13 bps | 100.00% |
| Vanguard Long Term Treasury-Inv (VUSTX) | 25 bps | Vanguard Long Term Treasury-Adm (VUSUX) | 12 bps | 108.33% |
| Vanguard Mid Cap Index-Inv (VIMSX) | 26 bps | Vanguard Mid Cap Index-Inst (VMCIX) | 8 bps | 225.00% |
| Vanguard Morgan Growth-Inv (VMRGX) | 43 bps | Vanguard Morgan Growth-Adm (VMRAX) | 29 bps | 48.28% |
| Vanguard Pacific Stock Index-Inv (VPACX) | 26 bps | Vanguard Pacific Stock Index-Inst (VPKIX) | 10 bps | 160.00 |
| Vanguard PRIMECAP-Inv (VPMCX) | 45 bps | Vanguard PRIMECAP-Adm (VPMAX) | 36 bps | 25.00% |
| Vanguard REIT Index-Inv (VGSIX) | 26 bps | Vanguard REIT Index-Inst (VGSNX) | 9 bps | 188.89% |
| Vanguard Short Term Bond Index-Inv (VBISX) | 22 bps | Vanguard Short Term Bond Index-Inst Plus (VBIPX) | 5 bps | 340.00% |
| Vanguard Short Term Federal-Inv (VSGBX) | 22 bps | Vanguard Short Term Federal-Adm (VSGDX) | 12 bps | 83.33% |
| Vanguard Short Term Investment Grade-Inv (VFSTX) | 24 bps | Vanguard Short Term Investment Grade-Inst (VFSIX) | 9 bps | 166.67% |
| Vanguard Short Term Treasury-Inv (VFISX) | 22 bps | Vanguard Short Term Treasury-Adm (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Index-Inv (NAESX) | 26 bps | Vanguard Small Cap Value Index Inst (VSIIX) | 8 bps | 225.00% |
| Vanguard Total Bond Market Index- Inv (VBMFX) | 22 bps | Vanguard Total Bond Market Index Inst Plus (VBMPX) | 5 bps | 340.00% |
| Vanguard Total Stock Market Index-Inv (VTSMX) | 17 bps | Vanguard Institutional Total Stock Market Index Inst Plus (VITPX) | 2 bps | 750.00% |
| Vanguard U.S. Growth-Inv (VWUSX) | 45 bps | Vanguard U.S. Growth-Adm (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index-Inv (VIVAX) | 26 bps | Vanguard Value Index-Inst (VIVIX) | 8 bps | 225.00% |

| | | | | |
|---|---|---|---|---|
| Vanguard Wellesley Income-Inv (VWINX) | 28 bps | Vanguard Wellesley Income-Adm (VWIAX) | 21 bps | 33.33% |
| Vanguard Wellington-Inv (VWELX) | 30 bps | Vanguard Wellington-Adm (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II-Inv (VWNFX) | 35 bps | Vanguard Windsor II-Adm (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor-Inv (VWNDX) | 33 bps | Vanguard WindsorAdm (VWNEX) | 22 bps | 50.00% |
| Vanguard Target Retirement 2010 Fund-Inv (VTENX | 14 bps | Vanguard Target Retirement 2010 Fund Inst (VIRTX) | 10bps | 40.00% |
| Vanguard Target Retirement 2015 Fund-Inv (VTXVX) | 14 bps | Vanguard Target Retirement 2015 Fund Inst (VITVX) | 10bps | 40.00% |
| Vanguard Target Retirement 2020 Fund-Inv (VTWNX) | 14 bps | Vanguard Target Retirement 2020 Fund Inst (VITWX) | 10 bps | 40.00% |
| Vanguard Target Retirement 2025 Fund-Inv (VTTVX) | 15 bps | Vanguard Target Retirement 2025 Fund Inst (VRIVX) | 10 bps | 50.00% |
| Vanguard Target Retirement 2030 Fund-Inv (VTTHX) | 15 bps | Vanguard Target Retirement 2030 Fund Inst (VITFX) | 10 bps | 50.00% |
| Vanguard Target Retirement 2035 Fund-Inv (VTTHX) | 15 bps | Vanguard Target Retirement 2035 Fund Inst (VITFX) | 10 bps | 50.00% |
| Vanguard Target Retirement 2040 Fund-Inv (VFORX) | 16 pbs | Vanguard Target Retirement 2040 Fund Inst (VIRSX) | 10 bps | 60.00% |
| Vanguard Target Retirement 2045 Fund-Inv (VTIVX) | 16 bps | Vanguard Target Retirement 2045 Fund Inst (VITLX) | 10 bps | 60.00% |
| Vanguard Target Retirement 2050 Fund-Inv (VFIFX) | 16 bps | Vanguard Target Retirement 2050 Fund Inst (VTRLX) | 10 bps | 60.00% |
| Vanguard Target Retirement 2055 Fund-Inv (VFFVX) | 16 bps | Vanguard Target Retirement 2055 Fund Inst (VIVLX) | 10 bps | 60.00% |
| Vanguard Target Retirement 2060 Fund-Inv (VTTSX) | 16 bps | Vanguard Target Retirement 2060 Fund Inst (VILVX) | 10 bps | 60.00% |

71.     The following table lists the significantly lower-cost share classes identical to the

Plan's Calvert mutual funds that were not used:

| Plan Mutual Fund | Plan Fee | Identical Lower Cost Mutual Fund | Identical Lower Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Calvert Global Water Class A (CFWAX) | 128 bps | Calvert Global Water Class I (CFWIX) | 93 bps | 37.63% |
| Calvert Balanced Portfolio Class A (CSIFX) | 97 bps | Calvert Balanced Portfolio Class I (CBAIX) | 62 bps | 56.45% |
| Calvert Moderate Allocation Class A (CMAAX) | 118 bps | Calvert Moderate Allocation Class I (CLAIX) | 83 bps | 42.17% |
| Calvert High Yield Bond Class A (CYBAX) | 107 bps | Calvert High Yield Bond Class I (CYBIX) | 74 bps | 44.59% |
| Calvert Income Class A (CFICX) | 106 bps | Calvert Income Class I (CINCX) | 64 bps | 65.63% |
| Calvert Large Cap Core Class A (CSXAX) | 54 bps | Calvert Large Cap Core Class I (CISCX) | 19 bps | 184.21% |
| Calvert Capital Accumulation Class A (CCAFX) | 121 bps | Calvert Capital Accumulation Class I (CCPIX) | 83 bps | 45.78% |
| Calvert International Equity Class A (CWVGX ) | 139 bps | Calvert International Equity Class I (CWVIX) | 96 bps | 44.79% |
| Calvert Long Term Income Fund Class A (CLDAX) | 113 bps | Calvert Long Term Income Fund Class I (CLDIX) | 55 bps | 105.45% |
| Calvert Small Cap Class A (CCVAX) | 137 bps | Calvert Small Cap Class I (CSVIX) | 91 bps | 50.55% |
| Calvert Ultra-Short Income Class A (CULAX) | 87 bps | Calvert Ultra-Short Income Class I (CULIX) | 50 bps | 74.00% |
| Calvert Global Energy Class A (CGAEX) | 185 bps | Calvert Global Energy Class I (CAEIX) | 140 bps | 32.14% |
| Calvert Large Cap Value Class A (CFJAX) | 57 bps | Calvert Large Cap Value Class I (CFJIX) | 22 bps | 159.01% |
| Calvert International Opportunities Class A (CIOAX) | 151 bps | Calvert International Opportunities Class I (COIIX) | 112 bps | 34.82% |

| | | | | |
|---|---|---|---|---|
| Calvert Bond Portfolio Class A (CSIBX) | 89 bps | Calvert Bond Portfolio Class I (CBDIX) | 51 bps | 74.51% |
| Calvert Short Duration Income Class A (CSDAX) | 95 bps | Calvert Short Duration Income Class I (CDSIX) | 49 bps | 93.88% |
| Calvert Equity Portfolio Class A (CSIEX) | 107 bps | Calvert Equity Portfolio Class I (CEYIX) | 66 bps | 62.12% |
| Calvert Aggressive Allocation Class A (CAAAX) | 126 bps | Calvert Aggressive Allocation Class I (CAGIX) | 91 bps | 38.46% |
| Calvert Conservative Allocation Class A (CCLAX) | 105 bps | Calvert Conservative Allocation Class I (CFAIX) | 70 bps | 50.00% |

**IV.  Defendants selected and retained a large number of duplicative investment options, diluting each of the Plans' ability to pay lower fees, and confusing participants.**

72.     Defendants provided a dizzying array of duplicative funds in the same investment style, thereby depriving the Plans of their bargaining power associated with offering a single fund in each investment style, which significantly reduces investment fees, and leading to "decision paralysis" for participants. Defendants included over 100 investment options for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, real estate, fixed income, money market, and stable value.

73.     In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had, on average, 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution*

*Trends,* at 28 (2015).[13] This provides choice of investment style to participants while maintaining a large pool of assets in each investment style and avoiding confusion.

74.     A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

75.     Prudent fiduciaries of large defined contribution plans must engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. Overall, the investment lineup should provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

76.     Within each asset class and investment style in the plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. Unlike Defendants, prudent fiduciaries do not select and retain numerous, duplicative investment options for a single asset class and investment style. When many investment options in a single investment style are made plan options, fiduciaries lose the bargaining power to obtain much lower investment management expenses for that style.

77.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to decision paralysis. *See* The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How*

---

[13] Available at https://www.callan.com/research/files/990.pdf

*Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments*, T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009) ("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[14]

78.     Moreover, having many actively managed funds in the Plans within the same investment style results in the Plans each effectively having an index fund return, while paying much higher fees for active management than the fees of a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

79.     The Plans included and continue to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (5 options), income and high yield bonds (22 options)**,** international (12 options**)**, large cap domestic equities (20 options), small and mid-cap domestic equities (12 options), money market (4 options), and target date/lifestyle investments (2 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and can lead to "decision paralysis".

80.     For illustration purposes, in the large cap blend investment style for the Plans, Defendants included eight actively managed or passively managed investment options for a combined asset amount of well in excess of $1 billion as of December 31, 2014. Those investments are summarized below and compared to a single lower-cost alternative that was available to the Plans: the Vanguard Institutional Index Fund (Inst Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

---

[14] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf

81.    For example, Defendants' inclusion of 7 large cap domestic blend investments as of December 31, 2014, are summarized below and compared to a single lower-cost alternative that was available to the Plans: the Vanguard Institutional Index Fund-Inst Plus (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Large Cap Blend Investments | 2014 Combined Plans Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| TIAA-CREF Stock | $987,734,856 | 38 bps | 2bps | 1750% |
| Calvert US Large Cap Core Responsible Index Fund A | $3,817,692 | 54 bps | 2bps | 2700% |
| TIAA-CREF Equity Index Account R3 | $117,300,581 | 37 bps | 2bps | 1750% |
| Vanguard 500 Index Fund Investor | $107,658,669 | 16 bps | 2bps | 750% |
| Vanguard Dividend Growth Fund Investor | $15,668,057 | 33 bps | 2bps | 1650% |
| Vanguard FTSE Social Index Fund Investor | $2,118,442 | 25 bps | 2bps | 1250% |
| Vanguard Growth and Income Fund Investor | $16,617,835 | 34 bps | 2bps | 1700% |
| Vanguard Total Stock Market Index Fund Investor | $42,687,462 | 16 bps | 2bps | 750% |

**V.    Defendants imprudently retained historically underperforming investments.**

82.    Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plans.

**A. Defendants imprudently retained the TIAA-CREF Stock Account R3.**

83.     The TIAA-CREF Stock Account R3 is one of the largest, by asset size, investment options in the Plans with almost $1 billion in assets. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the TIAA-CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category.

84.     The TIAA-CREF Stock Account is actively managed and subject to the risk that the adviser's usage of investment techniques and risk analyses to make investment decisions fails to perform as expected. This option has, for years, historically underperformed and continues to underperform its benchmark and other lower-cost investments that were available to the Plans.

85.     With 5 Stars being the highest rank and 1 Star being the lowest rank, Morningstar gives the TIAA-CREF Stock Account R3 a 2 star rating for the past 3, 5 and 10 years. During the same periods Morningstar ranks the TIAA-CREF Stock Account's performance in the bottom quartile in its investment category.

86.     Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

87.     Defendants failed to undertake such analysis when they selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the TIAA-CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. Defendants also provided the fund option without conducting a prudent analysis despite the

acceptance within the investment industry that the large cap domestic equity market is the most efficient market, and that active managers do not outperform passive managers net of fees in this investment style.

88.     Had such an analysis been conducted by Defendants, they would have determined that the TIAA-CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

89.     Rather than poor performance in a single year or two, historical performance of the TIAA-CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the TIAA-CREF Stock Account to its benchmark and to two other passively managed index funds in the same investment style, for the past six years. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Plus) (VITPX) and the Vanguard Institutional Index (Inst Plus) (VIIIX). Like the TIAA-CREF Stock Account, these options are large cap blend investments. For each comparison, the TIAA-CREF Stock Account dramatically underperformed the benchmark and index alternatives.



**Investment Growth**

07-31-2010 to 07-31-2016

Currency
USD

Initial Value: $1,000,000

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| Russell 3000 Growth PR USD (USD) | 113.82 | 13.50 | 2,138,187.59 |
| TIAA RSR A3-CREF Stock R3 (USD) | 84.59 | 10.76 | 1,845,911.03 |
| Vanguard Institutional Index Instl Pl (USD, VIIIX) | 124.14 | 14.40 | 2,241,371.60 |
| Vanguard Instl Ttl Stk Mkt Idx InstlPls (USD, VITPX) | 123.78 | 14.37 | 2,237,782.40 |

**Performance Disclosure**

*The performance data quoted represents past performance and does not guarantee future results. The investment return and principal value of an investment will fluctuate; thus an investor's shares, when redeemed, may be worth more or less than their original cost. Current performance may be lower or higher than return data quoted herein. For performance data current to the most recent month-end, please visit http://advisor.morningstar.com/familyinfo.asp.*

90.  A $1 million investment in the TIAA-CREF Stock Account R3 would have been worth $1,845,911 six years later. An investment in the Vanguard Institutional Index Institutional Plus Fund would have been worth $2,241,371. An investment in the Vanguard Institutional Total Stock Market Index Institutional Plus Fund would have been worth $2,237,782. The Russell 3000 Growth Index would have been worth $2,138,187. Overall, the TIAA-CREF Stock Account underperformed by approximately 19%. On a $1 billion investment, the underperformance amounted to almost $200 million dollars in losses to retirement savings.

91.  Apart from the abysmal long-term underperformance of the TIAA-CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as

imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the TIAA-CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. AonHewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[15] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4–5.

92.     The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829. In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the TIAA-CREF Stock Account. Defendants still retain the fund despite the fact that it continues to underperform lower-cost investment alternatives that were readily available to the Plans.

93.     Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the TIAA-CREF Stock Account would have been removed from the Plans.

---

[15] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740

94.     Had Defendants removed the TIAA-CREF Stock Account and the amounts been invested in any of the Vanguard or Russell 3000 Index alternatives, participants would not have lost nearly $200 million of their retirement savings.

**B. Defendants imprudently retained the TIAA-CREF Real Estate Account.**

95.     Defendants selected and continue to offer the TIAA-CREF Real Estate Account as a real estate investment option in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index Institutional Share Class (VGSNX).

96.     As of December 31, 2014, the Plans had invested $133,395,487 in the TIAA-CREF Real Estate Account. With an expense ratio of 87 bps as of December 31, 2014, the TIAA-CREF Real Estate Account was also over 10 times more expensive than the Vanguard REIT Index (Inst) with an expense ratio of 8 bps.

97.     The TIAA-CREF Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index. Nevertheless, Defendants selected and retained it in the Plans.

98.     As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA-CREF Real Estate Account as an investment option, despite its

continued dramatic underperformance and far higher cost compared to available investment alternatives.

99. The following performance chart compares the investment returns of a $1 million investment in the TIAA-CREF Real Estate Account and the Vanguard REIT Index for the past six years.



**Investment Growth**

07-31-2010 to 07-31-2016

Currency
USD

Initial Value: $1,000,000

| Investment | Cumulative Return % | Annualized Return % | Amount at End of Period $ |
|---|---|---|---|
| ● TIAA RSRA-TIAA Real Estate Account (USD) | 86.79 | 10.98 | 1,867,936.77 |
| ❷ Vanguard REIT Index I (USD, VGSNX) | 129.15 | 14.82 | 2,291,530.61 |

**Performance Disclosure**
The performance data quoted represents past performance and does not guarantee future results. The investment return and principal value of an investment will fluctuate; thus an investor's shares, when redeemed, may be worth more or less than their original cost. Current performance may be lower or higher than return data quoted herein. For performance data current to the most recent month-end, please visit http://advisor.morningstar.com/familyinfo.asp.

100. $1 million invested in the TIAA-CREF Real Estate Account was worth $1,867,936 six years later.  Had the same $1 million been invested in lower-cost and better-performing Vanguard REIT Index Institutional Class, it would have been worth $2,291,530. Had the Plan offered the Vanguard Fund, Plan participants would not have lost in excess of $20 million of their retirement savings.

34

## CLASS ACTION ALLEGATIONS

101. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of each of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. § 1109(a).

102. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of each the Plans. Plaintiff seeks to certify, and to be appointed as representatives of, the following class: All participants and beneficiaries of the Retirement Plan for Officers of Columbia University and the Columbia University Voluntary Retirement Savings Plan from August 22, 2010, through the date of judgment, excluding the Defendants.

103. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

    a.    The Class includes over 27,000 members and is so large that joinder of all its members is impracticable.

    b.    There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact

include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plans-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.        Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

d.        Plaintiff is an adequate representative of the Class because she was a participant in the Plans, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e.        Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability

to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

104.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

105.     Plaintiff's counsel, Sanford Heisler LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## COUNT I

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees

106.     Plaintiff restates and incorporates herein the preceding allegations of this complaint.

107.     This Count alleges breach of fiduciary duties against both Defendants.

108.     The scope of the fiduciary duties and responsibilities of Defendants includes discharging their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries, defraying reasonable expenses of

administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

109.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other record keepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and record keeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey*, 746 F.3d at 336.

110.    Defendants failed to engage in a prudent and loyal process for selecting a record keeper. Rather than consolidating the Plans' administrative and recordkeeping services under a single service provider, Defendants retained two vendors to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plans' abilities to obtain the same services at a lower cost with a single record keeper. This conduct was a breach of the duties of loyalty and prudence.

111.    Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plans' record keepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plans. As the amount of assets grew, the revenue sharing payments to the Plans' record keepers grew, even though the services provided by the record keepers remained the same. This caused the recordkeeping compensation paid to the record keepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

112.   Total combined losses to the Plans will be determined at trial after complete discovery in this case and are continuing.

113.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

114.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

## Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses

115.   Plaintiff restates and incorporates the allegations contained in the preceding paragraphs as though fully set forth here.

116.   This Count alleges breach of fiduciary duties against both Defendants.

117.   The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plans for the sole and exclusive benefit of participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that each of the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring each of the Plan's investments on an ongoing basis and eliminating

imprudent ones, and taking all necessary steps to ensure that each of the Plan's assets were invested prudently.

118.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

119.    Defendants selected and retained as investment options mutual funds and insurance company variable annuities with far high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

120.    Rather than consolidating the Plans' over 100 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained duplicative investment options in each asset class and investment style. Defendants thereby deprived the Plans of their ability to qualify for lower-cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion. In addition, Defendants, as fiduciaries charged with operating as prudent financial experts, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower cost share class mutual funds with the identical investment manager and investments, and lower-cost insurance company variable annuities and insurance company pooled separate

accounts. Defendants therefore failed to make investment decisions for the Plans based solely on the merits of the investment funds and what was in the interest of participants. In so doing, Defendants failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. Therefore, Defendants breached their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

121.    The same conduct by Defendants shows a failure to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B).

122.    Defendants failed to engage in a prudent process for the selection and retention of investment options. Rather, Defendants used more expensive funds with inferior historical performance compared to investments that were available to the Plans.

123.    **TIAA-CREF Stock Account**: Defendants selected and retained the TIAA-CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

124.    **TIAA-CREF Real Estate Account**: Defendants selected and retained the TIAA-CREF Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

125.    Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for

reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose hundreds of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

126.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

127.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

128.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT III

### Failure to Monitor Fiduciaries

129.    Plaintiff restates and incorporates the allegations contained in the preceding paragraphs as though fully set forth here.

130.    This Count alleges breach of fiduciary duties against Defendant Columbia University.

131.    Defendant Columbia University is the Plan Sponsor of the Plan and has delegated to Dianne Kenney the duty to serve as administrator with exclusive responsibility and complete

discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

132.     Defendant Columbia University, acting through its Vice President of Human Resources, is responsible for the general administration of the Plans and carrying out each of the Plan's provisions.

133.     Given that Defendant Columbia University had the overall responsibility for the oversight of the Plans, Defendant Columbia University had a fiduciary responsibility to monitor the performance of the other fiduciaries, including those delegated fiduciary responsibility to administer and manage the Plans' assets.

134.     A monitoring fiduciary must ensure that its monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

135.     Defendant Columbia University breached its fiduciary monitoring duties by, among other things:

  a.   Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plans;

b.     Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plans' investments in violation of ERISA;

c.     Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' record keeper and the amount of any revenue sharing payments; a process to prevent the record keeper from receiving revenue sharing that would increase the record keeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

d.     Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' mutual fund and insurance company variable annuity options; and

e.     Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of participants' retirement savings.

136.     Had Defendant Columbia University discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans,

the Plaintiff, and the other Class members, lost hundreds of millions of dollars of retirement savings.

137. Defendant Columbia University is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## JURY TRIAL DEMANDED

138. Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plans and all similarly situated participants and beneficiaries in the Plans, respectfully requests that the Court:

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plans $100,000,000.00 in losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plans losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plans to include only prudent investments;

- Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Certify the Class, appoint the Plaintiff as a class representative, and appoint Sanford Heisler LLP as Class Counsel;

- Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.


Dated:  August 16, 2016                    Respectfully submitted,


_____

By:

Jeremy Heisler, New York Bar No. 1653484
jheisler@sanfordheisler.com
**SANFORD HEISLER LLP**
1350 Avenue of the Americas
31st Floor
New York, New York 10019
Phone:  646.402.5650

David Sanford, D.C. Bar No. 457933

dsanford@nydclaw.com
**SANFORD HEISLER, LLP**
1666 Connecticut Ave. NW
Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7780
Facsimile:  (202) 742-7776

Charles H. Field, CA Bar No. 189817
cfield@sanfordheisler.com
Edward Chapin, CA Bar No. 053287
**SANFORD HEISLER LLP**
501 West Broadway
Suite 515
San Diego, California  92101
Phone:  619.577.4252

Attorneys for Plaintiff